Hart L. Robinovitch (AZ SBN 020910)
**ZIMMERMAN REED LLP**
14646 North Kierland Blvd., Suite 145
Scottsdale, AZ  85254
Telephone: (480) 348-6400
Facsimile: (480) 348-6415
Email:   hart.robinovitch@zimmreed.com

Elaine A. Ryan (AZ Bar #012870)
Carrie A. Laliberte (AZ Bar #032556)
**BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.**
2325 E. Camelback Rd., Suite 300
Phoenix AZ 85016
Telephone:        (602) 274-1100
Email:  eryan@bffb.com
          claliberte@bffb.com

*Attorneys for Plaintiffs and the Class*

*(Additional Counsel listed below)*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Chris Griffey, et al.,<br><br>                Plaintiffs,<br>v.<br><br>Magellan Health, Incorporated,<br><br>                Defendant. | No. CV-20-01282-PHX-MTL (Lead)<br>No. CV-20-01350-PHX-MTL (Consol.)<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>(Assigned to the Honorable Michael T. Liburdi) |
| Daniel Ranson, et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>Magellan Health, Incorporated,<br><br>                Defendant. | |

Plaintiffs Chris Griffey, Bharath Maduranthgam Rayam, Michael Domingo, Laura Leather, Clara Williams, Daniel Ranson, Mitchell Flanders, Joseph Rivera, Teresa Culberson, and Keith Lewis, on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this consolidated class action lawsuit against Defendant Magellan Health, Inc. to obtain damages, restitution, and injunctive relief from Defendant for the Class, as defined below, resulting from an April 2020 targeted cyberattack and data breach (the "Data Breach"), and allege, based upon information and belief, the investigation of their counsel, and the facts that are a matter of public record:

## PARTIES

1.     Plaintiff Chris Griffey is, and at all times mentioned herein was, a citizen of the state of Missouri residing in the city of Wildwood.  Plaintiff Griffey was employed by Magellan Health from December 12, 2011 through July 6, 2016.  During the summer of 2020, Plaintiff Griffey received notice from Magellan that the Data Breach had occurred following an attack on Magellan's computer systems.  A copy of the notice is attached hereto as Exhibit A.

2.     Plaintiff Bharath Maduranthgam Rayam is, and at all times mentioned herein was, a citizen of the state of Tennessee residing in the city of Nashville.  Plaintiff Rayam was employed by Magellan Health from March 16, 2020 through May 8, 2020.  Plaintiff Rayam received notice of the Data Breach, and a copy of the notice is attached hereto as Exhibit B.

3.     As a result of the Data Breach, Plaintiff Rayam learned that an unauthorized and fraudulent charge in the amount of $3.79 was made to his credit card.  While not a significant sum, Plaintiff Rayam is informed and believes that the charge was an attempt to test whether his account remained open for possibly a larger withdrawal later.  As a result of that charge, Plaintiff Rayam was required to report the issue to the bank that issued the card and to request a new card.  Around the same time, Plaintiff Rayam began receiving spam telephone calls and spam text messages daily, which even interrupt him

while he is at work.  As a result of those calls, and Plaintiff Rayam's efforts to block them, he has blocked nearly 500 numbers from calling his phone.

4.     Plaintiff Michael Domingo is, and at all times mentioned herein was, a citizen of the state of Pennsylvania residing in the city of Jamison.  Plaintiff Domingo was employed by Magellan Health from August 2016 through February 29, 2020. Plaintiff Domingo received notice of the Data Breach, and a copy of the notice is attached hereto as Exhibit C.

5.     Plaintiff Laura Leather is, and at all times mentioned herein was, a citizen of the state of New York residing in the city of Dover Plains.  Upon information and belief, Magellan Health provided services to Plaintiff Leather's employer and/or to her health plan. Plaintiff Leather received notice of the Data Breach, and a copy of the notice is attached hereto as Exhibit D. As a result of the Data Breach, Plaintiff Leather has taken responsive measures such as individually paying for a credit monitoring and protection service, something that she otherwise would not have incurred to ensure that her identity is not stolen and that her personal affairs are not further compromised.  In addition, since the breach, she has learned that her e-mail and phone number were made available on the "Dark Web" and she has been receiving deeply disturbing pornographic texts.  These events did not occur prior to the Data Breach.  She also has noticed a marked increase in spam calls to her cell phone,  As a result, she has spent many hours trying to block calls and attempts to text her, as well as remains worried and stressed that a hacker will use her information to inflict further damage to her credit and to her pocketbook.

6.     Plaintiff Clara Williams is, and at all times mentioned herein was, a citizen of the state of Arizona residing in the city of Apache Junction.  Plaintiff Williams was employed by Magellan Health from July 2017 through November 2017.  While employed with Magellan Health, Plaintiff Williams was a member of a health plan serviced by Magellan Health. Plaintiff Williams received notice of the Data Breach, and a copy of the notice is attached hereto as Exhibit E.

7.     As a result of the Data Breach, a criminal used Plaintiff Williams' name and Social Security number to apply for Arizona Unemployment Benefits. Plaintiff Williams became aware of this fraud in June 2020, when she received a letter from the Arizona Department of Economic Security ("ADES") notifying her of an award of benefits for which she did not apply. Plaintiff Williams thereafter contacted ADES, filed an incident report with her local police department, filed a fraud report with ADES, filed a report with the Arizona Attorney General's Office, filed a report with the Federal Trade Commission, filed a report with the Federal Inspector General's Office, contacted her local Social Security Office, contacted all three credit bureaus and locked her credit reports, and contacted her current employer's human resource department.

8.     Plaintiff Daniel Ranson is, and at all times mentioned herein was, a citizen and resident of California. Plaintiff Ranson is a licensed clinical social worker in California and currently practices as a psychotherapist in Mammoth Lakes, California. At the time of the Data Breach, Plaintiff had contracted with Magellan to treat behavioral health patients with Human Affairs International of California ("HAIC"), a wholly owned subsidiary of Magellan Healthcare, Inc., which serves as a mental health service administrator ("MHSA") for Blue Shield of California, Blue Shield Life & Health Insurance Company, and other health plans.[1]  Plaintiff Ranson received written notice of the Data Breach, and a true and correct copy of that Notice is attached hereto as Exhibit F.

9.     As a result of the Data Breach, Plaintiff Ranson enrolled in a credit monitoring service to protect himself against the unauthorized use of his data, and he changed passwords associated with his online accounts. As a health care provider with a busy practice, Plaintiff Ranson had to take time away from his practice to review his credit reports and accounts. He still scrutinizes all his accounts on a level much greater than before the Data Breach. Following the filing of his complaint in his related case,

---

[1] As an MHSA, Magellan manages healthcare services for approximately 40 million members nationwide, which includes the offering of provider networks.

*Ranson v. Magellan Health*, No. CV-20-01350-PHX-MTL (D. Ariz.), a thief who had obtained his private information as a result of the Data Breach was able to successfully open an account with AT&T under Ranson's name. As a direct and proximate result of that fraudulent account opening, Plaintiff Ranson was required to spend considerable time trying to resolve the problem – time that he could have spent on other aspects of his professional and personal life. He likewise suffered the erroneous reporting of that account to his credit report.

10. Shortly after the filing of his complaint, the Defendant notified Plaintiff Ranson that it was going to perform an audit of his billing and treatment, only to rescind that notification audit later that same day. Plaintiff Ranson is informed and believes that the audit was prompted by his participation in this lawsuit.

11. Plaintiff Mitchell Flanders is, and at all times mentioned herein was, a citizen and resident of Virginia. In 2018, Plaintiff Flanders worked as an intern for Magellan Federal (formerly the Armed Forces Services Corporation), another Magellan subsidiary, prior to being promoted to a full-time position, where he worked until his resignation from the company in 2019. He is currently unaffiliated with Magellan. Plaintiff Flanders received written notice of the Data Breach, and a true and correct copy of that notice is attached hereto as Exhibit G. As a result of the Data Breach, Plaintiff Flanders has increased the time spent monitoring his accounts, and recently paid a cybersecurity consultant to search the "Dark Web" for his information following the breach, and the consultant discovered that his Social Security Number had indeed been exposed and was available for purchase on the black market.

12. Plaintiff Joseph Rivera is, and at all times mentioned herein was, a citizen and resident of Wisconsin. Plaintiff Rivera was employed by Abbott Laboratories from May 2001 through May 2012. In 2012, Abbott Laboratories split into two divisions, and Plaintiff Rivera became an employee of Abvie and continues to be employed with Abvie. During the time that Plaintiff Rivera was employed by Abbot Laboratories (May 2001-May 2012), Magellan Health administered Abbott Laboratories' health care plan in which

4

Plaintiff Rivera was a participant. Plaintiff Rivera received written notice of the Data Breach by letter dated June 18, 2020, and a true and correct copy of that notice letter is attached hereto as Exhibit H.

13.     Plaintiff Teresa Culberson is, and at all times mentioned herein was, a citizen and resident of Tennessee.  Plaintiff Culberson was an insured under Magellan's Rx Medicare program. On or about June 15, 2020, Plaintiff Culberson received a letter from Magellan notifying her that her information was compromised as the result of an April 11, 2020 Data Breach at Magellan, and a true and correct copy of that notice letter is attached hereto as Exhibit I.

14.     Plaintiff Keith Lewis is a citizen and resident to Florida.  On or about July 24, 2020, Plaintiff Lewis received a notice from Magellan, like those received by the other plaintiffs, that his information had been compromised during the Data Breach.  A true and correct copy of the notice sent to Plaintiff Lewis is attached hereto as Exhibit J.

15.     At the time of the breach, Plaintiff Lewis had a free account with Experian that provided a very basic level of monitoring his credit report.  Upon receiving the notice, and because he was concerned that his data had been stolen, he upgraded from the free service to a more robust plan, which costs $24.99 monthly.  Recently, he has received several e-mails from the service about various "hits" to his credit.  For example, he had 13 unfamiliar accounts go to collections.  As a result, he has spent and continues to spend significant time disputing and attempting to resolve the fraudulent accounts.  In addition, he had both his Chase and Bank of American checking accounts involuntarily closed due to repeated suspicious activity within the last two months and, consequently, he had to open new accounts.   He received two debit cards in the mail from GreenDot even though he did not apply for them.   And, his mother, whose number was associated with his protected health information, has also received suspicious phone calls referencing her son, where the caller repeatedly attempts to send the mother a delivery on behalf of Plaintiff Lewis and asks his mother to confirm her son's address and date of birth. Plaintiff attributes all this activity to the Data Breach.

16.     Defendant Magellan Health is a publicly traded Delaware corporation headquartered at 4801 E. Washington Street, Phoenix, Arizona 85034. It operates three segments with various wholly owned subsidiaries, including but not limited to, HAIC and Magellan Federal.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class are citizens of states different from Defendant.

18.     This Court has jurisdiction over Defendant, which operates and is headquartered in this District. The computer systems implicated in this Data Breach are also likely based in this District. Through its business operations in this District, Magellan and its related subsidiaries intentionally avail themselves of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District. Defendant is headquartered in this District, where it maintains personally identifiable information ("PII"),  and protected health information ("PHI") on its current and former employees as well as members participating in various health plans it administers, and has caused harm to Plaintiffs and Class Members, some of whom reside in this District.

## NATURE OF THE ACTION

20.     This class action arises out of the most recent Data Breach involving Defendant and its subsidiaries and affiliates.[2]  As a result of the Data Breach, the PII and

---

[2]  Magellan Health, Inc.'s affiliates involved in the breach include but are not limited to: Magellan Healthcare, Inc. (55,637 patients), Merit Health Insurance Company (102,748 patients), Florida MHS, Inc. d/b/a Magellan Complete Care of Florida (76,236 patients),

PHI of Plaintiffs and at least 365,000 Class Members is in the hands of cyberthieves. Plaintiffs and Class Members suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.   In addition, Plaintiffs' and Class Members' sensitive personal information—which was entrusted to Magellan Health, its officials and agents—was compromised and unlawfully accessed due to the Data Breach.   Information compromised in the Data Breach included names, contact information, employee ID numbers, and W-2 or 1099 information, including Social Security Numbers or taxpayer identification numbers, treatment information, health insurance account information, member IDs, other health-related information, email addresses, phone numbers, physical addresses, and additional PII.

21.     Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII and PHI that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

22.     Defendant maintained the PII and PHI of its employees and health plan participants in a reckless and negligent manner.   In particular, the PII and PHI was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. The mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' PII and PHI was a known risk to Defendant, as it was subject to another Data Breach a mere 11 months prior that involved a similar phishing attack. Thus, Defendant was on notice that failing to take steps necessary to secure the PII and PHI from those risks left that property in a dangerous condition.

---

the University of Florida Health Jacksonville (54,002 patients), Magellan  Healthcare of Maryland, LLC (50,410 patients), VRx Pharmacy (33,040 patients), National Imaging Associates, Inc. (22,560 patients), UF Health Shands (13,146 patients), UF Health (9,182 patients), and Magellan Complete Care of Virginia, LLC (3,568 patients).

23.    In addition, Magellan Health and its employees failed to properly monitor the computer network and systems that housed valuable PII and PHI. Had Magellan Health properly monitored its property, it would have discovered the intrusion sooner.

24.    Plaintiffs' and Class Members' identities are now at risk because of Defendant's reckless and negligent conduct, because the PII and PHI that Defendant and its affiliates collected and maintained is now in the hands of data thieves and available on the dark web.

25.    Armed with the PII and PHI accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' health information to target other phishing and hacking intrusions based on their individual health needs, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names, but with another person's photograph, and giving false information to police during an arrest.

26.    As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer damages and economic losses in the form of:  1.) having fraudulent charges and debits applied to their personal accounts; 2.) losses incurred as a result of paying for credit monitoring and fraud alert services; and 3.) the loss of time needed to: take appropriate measures to avoid unauthorized and fraudulent charges; change their usernames and passwords on their accounts; investigate, correct and resolve unauthorized debits, charges, and fees charged against their accounts; deal with spam messages and e-mails received as a result of the Data Breach; respond to false unemployment claims; and file reports with both regulatory authorities and law enforcement.  Additionally, because Plaintiffs and Class Members have and will continue to have erroneous information regarding fraudulent accounts and changes to their credit reports, Plaintiffs and Class Members will have to not only spend time trying to resolve those matters, but will suffer from lower credit scores and pay higher interest rates for

8

credit, ultimately paying more money than they would have prior to the Data Breach. Plaintiffs and Class Members have likewise suffered and will continue to suffer an invasion of their property interest in their own PII and PHI such that they are entitled to damages for unauthorized access to and misuse of their PII and PHI from Defendant. And, Plaintiffs and Class Members will suffer from future damages associated with the unauthorized use and misuse of their PII and PHI as thieves will continue to use the information to obtain money and credit in their name for several years.   By their Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose PII and PHI was accessed during the Data Breach.

27.     Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, restitution, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

28.     Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence; (ii) negligence *per se*; (iii) breach of implied contract; (iv) unjust enrichment; (v) violation of the Arizona Consumer Fraud Act; (vi) violation of California's Unfair Competition Law; (vii) violation of Missouri's Merchandising Practices Act; (viii) violation of New York's General Business Law § 349; (ix) violation of Pennsylvania's Unfair and Deceptive Trade Practices and Consumer Protection Law; (x) violation of Virginia's Personal Information Breach Notification Act; and (xi) violation of Wisconsin's Deceptive Trade Practices Act.

## STATEMENT OF FACTS

### A.   *Defendant Magellan Health*

29.     Incorporated in 1969 in Delaware, Defendant Magellan Health is a for-profit managed health care company focused on special populations, complete pharmacy benefits, and other specialty areas of healthcare.

9

30.     Defendant directly manages health benefits for its members' patients, including those of its affiliates/subsidiaries Magellan Healthcare, Inc. (55,637 patients); Merit Health Insurance Company (102,748 patients), Florida MHS, Inc. d/b/a Magellan Complete Care of Florida (76,236 patients), the University of Florida Health Jacksonville (54,002 patients), Magellan Healthcare of Maryland, LLC (50,410 patients), VRx Pharmacy (33,040 patients), National Imaging Associates, Inc. (22,560 patients), UF Health Shands (13,146 patients), UF Health (9,182 patients), and Magellan Complete Care of Virginia, LLC (3,568 patients).

31.     As part of its contractual relationship with the aforementioned affiliates/subsidiaries and several other providers, Magellan administers the health and pharmaceutical benefits offered by those affiliates/subsidiaries. Magellan Health received fees from those affiliates or the states in which they operate to administer those benefits and to provide services related to those benefits to Class Members, which included storing Class Members' personal data on its computers and computer systems. The fees received by Defendant for these services are accrued and paid as a result of Class Members' participation in and payment for these health and pharmaceutical plans.

**B.**     ***The Data Breach***

32.     On or about April 6, 2020, an unauthorized person gained access to an employee's e-mail by impersonating a client of Magellan.  That access led to a ransomware attack that allowed the person to gain access to and extract sensitive data from a Magellan server.

33.     The stolen data included sensitive PII and PHI, including names, addresses, employees' ID numbers, and W-2 and 1099 details (including Social Security Numbers, and Taxpayer ID numbers) of current and former employees and Magellan providers.

34.     This was the second such data breach to occur at Magellan within the last year, with notices of the breaches only surfacing within the last six months.

35.     The first breach occurred on May 28, 2019, again after an unauthorized third party had gained access to an employee email account through a commonplace

phishing attack.  That breach resulted in the exposure of sensitive patient PHI and PII, including patient names, Social Security Numbers, health plan member ID numbers, health plan names, provider information, and prescription drug names.

36.     However, despite discovering the breach during the summer, Magellan did not notify individuals affected by the first breach until November of 2019.  A related class action concerning that breach has been filed in the Maricopa County Superior Court of Arizona, Case No. CV2020-013648, after being previously filed in this District, *Dearing v. Magellan Health, Inc., et al.*, 2:20-cv-0-0747-SPL (D. Ariz.).[3]

37.     During the more recent Data Breach, Magellan's servers were hit by a ransomware attack.  A ransomware attack deploys a type of malicious software that blocks access to a computer system or data, usually by encrypting it, until the victim pays a fee to the attacker.[4]

38.     Magellan detected the ransomware attack on April 11, 2020 when files were encrypted on its systems.  An investigation into the attack allegedly revealed the attacker had gained access to its systems following a response to a spear phishing email sent on April 6.

39.     A Magellan Health employee had inappropriately responded to the email phishing scheme while the company was still managing the effects of the first breach, allowing unauthorized actors to gain access to the employees' email accounts.

40.     The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect PII and PHI, including the PII of its employees (including Plaintiffs) and the PII and PHI of

---

[3] The first Magellan case was dismissed as to the 44,000 TennCare beneficiaries for failure to allege Article III standing. The case was refiled in state court under the more liberal state law standing requirements. The facts and the alleged injuries of the first Magellan (TennCare) complaint are distinct from those presented here.

[4] *What Is Ransomware?* Proofpoint, https://www.proofpoint.com/us/threat-reference/ransomware (last visited October 28, 2020).

participants in the health and pharmaceutical plans of the aforementioned affiliates/subsidiaries.

41.    On or about May 12, 2020, more than a month after the attack, Magellan Health notified affected persons and various governmental agencies of the Data Breach. The Notice of Data Incident ("Notice") stated, in relevant part:

### Notice of Data Incident

*What Happened*

On April 11, 2020, Magellan Health discovered it was targeted by a ransomware attack. The unauthorized actor gained access to Magellan Health's systems after sending a phishing email on April 6 that impersonated a Magellan Health client. Once the incident was discovered, Magellan Health immediately retained a leading cybersecurity forensics firm, Mandiant to help conduct a thorough investigation of the incident. The investigation revealed that prior to the launch of the ransomware, the unauthorized actor exfiltrated a subset of data from a single Magellan Health corporate server, which included some of your personal information.  In limited instances, and only with respect to certain current employers, the unauthorized actor also used a piece of malware designed to steal login credentials and passwords. At this point, we ae not aware of any fraud or misuse of your personal information as a result of this incident, but we are notifying you out of an abundance of caution.

*What Information Was Involved*

The exfiltrated records include personal information such as names, address, employee ID number, and W-2 OR 1099 details such as Social Security number of Taxpayer ID number and, in limited circumstances, may also include usernames and passwords.

*What We Are Doing*

Magellan immediately reported the incident to, and is working closely with, the appropriate law enforcement authorities, including the FBI.  Additionally, to help prevent a similar type of incident from occurring in the future, we implemented additional security protocols

designed to protect out network, email environment, systems, and personal information.[5]

42.     Upon information and belief, this notice was sent to 50,410 persons, and was reported to the U.S. Department of Health and Human Services ("HHS") on June 12, 2020.

43.     On June 12, 2020, Defendant subsequently issued a second notice of Data Breach to the plan participants of Complete Care of Florida and Magellan Rx Pharmacy of Maryland and reported the Data Breach for Magellan Health to HHS.  This notice was sent to 76,236 plan participants of Complete Care of Florida, and 33,040 plan participants of Magellan Rx Pharmacy of Maryland.

44.     This second notice of Data Breach stated, in pertinent part:

**Notice of Security Incident**

Magellan Health, Inc. and its subsidiaries and affiliates ("MAGELLAN") recently discovered a ransomware attack. We are providing notice of this incident, along with background information of the incident and steps that those affected can take.

*What Happened*

On April 11, 2020 we discovered that we were the target of a ransomware attack. Immediately after discovering the incident we retained a leading cybersecurity forensics firm, Mandiant, to help conduct a thorough investigation of the incident.  The

---

[5]https://oag.ca.gov/system/files/MAGELLAN%20-20Sample%20Individual%20Notice. pdf (last visited August 3, 2020).  However, since the filing of the Second Amended Complaint in the *Griffey* matter, the page become unavailable.  An archived version of the above URL can be found on the Internet Archive, available at https://web.archive.org/web/20201005041745/https://oag. ca.gov/system/files/MAGELLAN%20-%20Sample%20Individual%20Notice.pdf    (last visited October 28, 2020).

investigation revealed that the incident may have affected personal information.

**We have no evidence that any personal data has been misused.**

*What Information Was Involved*

The personal information included names and one or more of the following: treatment information, health insurance account information, member ID, other health-related information, email addresses, phone numbers, and physical addresses.  In certain instances, Social Security Numbers were also affected.

*What Are We Doing*

We immediately reported the incident to, and are working closely with, law enforcement including the FBI.  To help prevent a similar incident from occurring in the future, we have implemented additional security protocols designed to protect our network, email environment, systems, and personal information.

A copy of this second notice is posted on Defendant's website.[6]

45.     While clearly related to the same ransomware attack and Data Breach as the May 15, 2020 Notice, the June 12, 2020 notice varies markedly from the May notice, in that the June 12, 2020 notice provides far less information about the specific facts of the cyberattack, does not mention the exfiltration of data that the May notice admits, and does not offer any credit monitoring option to the persons to whom the notice was sent.

46.     On June 15, 2020, Defendant issued a notice identical in form to the June 12, 2020 notice to persons affected by this Data Breach who were plan participants of Defendant's affiliate/subsidiary Magellan Complete Care of Virginia, LLC, and reported the Data Breach for that affiliate to HHS on that same date.

47.     On June 26, 2020, Defendant issued another notice of the Data Breach to persons enrolled in health plans serviced by Defendant.  This includes Plaintiff Leather.

---

[6]   https://www.magellanhealth.com/news/security-incident/ (last visited October 28, 2020).

14

48.     The June 26, 2020 notice of Data Breach stated, in pertinent part:

Magellan Health, Inc. ("Magellan") was recently the victim of a criminal ransomware attack. We are writing to let you know how this incident may have affected your personal information and, as a precaution, to provide steps you can take to help protect your information.

*What Happened*

On April 11, 2020, Magellan discovered it was targeted by a ransomware attack. The unauthorized actor gained access to Magellan's systems after sending a phishing email on April 6 that impersonated a MAGE Magellan LLAN client. Once the incident was discovered, Magellan immediately retained a leading cybersecurity forensics firm, Mandiant, to help conduct a thorough investigation of the incident.  The investigation revealed that the incident may have affected your personal information. At this point, we are not aware of any fraud or misuse of any of your personal information as a result of the incident, but are notifying you out of an abundance of caution.

*What Information Was Involved*

The personal information accessed by the unauthorized actor included your Social Security number and/or other financial information and possibly included names and one or more of the following:   treatment   information,   health   insurance   account information, member ID, other health-related information, email addresses, phone numbers, and physical addresses.    In certain instances, Social Security Numbers were also affected.

*What Are We Doing*

Magellan immediately reported the incident to, and is working closely with, the appropriate law enforcement authorities, including the FBI.  Additionally, to help prevent a similar type of incident from occurring in the future, we have implemented additional security protocols   designed   to   protect   our   network,   email   environment, systems, and personal information.

49.     While clearly related to the same ransomware attack and Data Breach as the May 15, 2020 Notice, the June 26, 2020 notice varies markedly from the May notice, in that the June 26, 2020 notice reveals that the exfiltrated data included Plaintiff Leather's Social Security number.

### D.   Magellan's Obligations to Keep PII and PHI Secure

50.   Due to its business and operations, Magellan is obligated by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") to comply with a series of administrative, physical security, and technical security requirements in order to protect sensitive patient information. Among other things, the law mandates Magellan develop, publish, and adhere to a privacy practice.

51.   It is well known that healthcare organizations have been the target of an increasing number of cyberattacks and, as a result, they must take adequate and reasonable steps to protect their systems from attack, regardless of who the intended or incidental victims are.  This includes not only protecting patient information but also employee data.

52.   Defendant assures its patients, members, and other consumers that "[y]our personal privacy is important to us."[7]  Magellan Health's Privacy Policy further states: "Magellan uses physical, technical, and administrative safeguards to protect any personally identifiable data stored on its computers.  Only authorized employees and third parties have access to the information you provide to Magellan for providing service to you."[8]

53.   As such, Magellan recognizes its obligations under HIPAA to safeguard and protect patient PHI and PII.  These obligations also extend to Magellan employees, as the company has an established Privacy Policy that details the types of PII and PHI Magellan collects from its employees, providers, and patients, among others.[9]

---

[7]  https://www.magellanhealth.com/privacy-policy/#:~:text=MAGELLAN%20uses%20physical%2C%20technical%2C%20and,for%20providing%20service%20to%20you (last visited October 28, 2020).

[8] Id.

[9]  https://www.magellanhealth.com/privacy-policy/#:~:text=MAGELLAN%20uses%20physical%2C%20technical%2C%20and,for%20providing%20service%20to%20you (last visited October 28, 2020).

16

Additionally, under various federal and state laws, regulations, industry practices and common law, Magellan is bound to safeguard and protect the personal data of its employees, providers, and patients to avoid unauthorized disclosure to third parties.

**E.   Prevalence of Cyber Attacks and Susceptibility of the Healthcare Sector**

54.   Data Breaches have become widespread and especially so in healthcare.  In 2016, the number of U.S. Data Breaches surpassed 1,000, a record high representing a 40% increase in the number of Data Breaches from the previous year.   In 2017, another record high of 1,579 breaches were reported, representing a 44.7% increase over 2016.[10] In 2018, there was an extreme jump of 126% in the number of consumer records exposed from Data Breaches.  In 2019, there was a 17% increase in the number of breaches (1,473) over 2018, with 164,683,455 sensitive records exposed.[11]

55.   Not surprisingly, companies in the business of storing and maintaining PII and PHI, such as Magellan Health are among the most targeted—and therefore at risk— for cyber-attacks.[12]

56.   Cyberattacks may come in many forms. Phishing attacks are among the oldest, most common, and well known.  In simple terms, phishing is a method of obtaining personal information using deceptive e-mails and websites. The goal is to trick an e-mail recipient into believing that the message is something they want or need from a legitimate or trustworthy source and to subsequently take an action such as clicking on a link or downloading an attachment. The fake link will typically mimic a familiar

---

[10]   Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review*, https://www.idtheftcenter.org/2017-data-breaches/ (last visited October 28, 2020).

[11]   Identity Theft Resource Center *Identity Theft Resource Center's Annual End-of-Year Data Breach Report Reveals 17 Percent Increase in Breaches Over 2018*, https://www.idtheftcenter.org/identity-theft-resource-centers-annual-end-of-year-data-breach-report-reveals-17-percent-increase-in-breaches-over-2018/ (last visited October 28, 2020).

[12]   Cyber Security Hub, *Top 8 Industries Reporting Data Breaches in The First Half Of 2019*, https://www.cshub.com/attacks/articles/top-8-industries-reporting-data-breaches-in-the-first-half-of-2019 (last visited October 28, 2020).

website and require the input of credentials. Once input, the credentials are then used to gain unauthorized access into a system.  "It's one of the oldest types of cyberattacks, dating back to the 1990s" and one that every organization with an internet presence is aware."[13] It remains the "simplest kind of cyberattack and, at the same time, the most dangerous and effective."[14]

57.     Phishing attacks are well understood by the cyberprotection community and are generally preventable with the implementation of a variety of proactive measures such as sandboxing inbound e-mail[15], inspecting and analyzing web traffic, penetration testing[16], and employee education, among others.

58.     Among various data, healthcare related data is some of the most sensitive and personally consequential when it is compromised. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident…came to about $20,000," and that the victims were often forced to pay out-of-

---

[13] *What is phishing? How this cyber attack works and how to prevent it*, CSO Online, February 20, 2020, https://www.csoonline.com/article/2117843/what-is-phishing-how-this-cyber-attack-works-and-how-to-prevent-it.html (last visited October 28, 2020).

[14] *Phishing*, Malwarebytes, https://www.malwarebytes.com/phishing/ (last visited October 28, 2020).

[15] Sandboxing is an automated process whereby e-mail with attachments and links are segregated to an isolated test environment, or a "sandbox," wherein a suspicious file or URL may be executed safely.

[16] Penetration testing is the practice of testing a computer system, network, or web application to find security vulnerabilities that an attacker could exploit. The main objective of penetration testing is to identify security weaknesses. Penetration testing can also be used to test an organization's security policy, its adherence to compliance requirements, its employees' security awareness and the organization's ability to identify and respond to security incident. The primary goal of a penetration test is to identify weak spots in an organization's security posture, as well as measure the compliance of its security policy, test the staff's awareness of security issues and determine whether -- and how -- the organization would be subject to security disasters. *See* https://searchsecurity.techtarget.com/definition/penetration-testing (last visited October 28, 2020).

pocket costs for health care they did not receive in order to restore coverage.[17]  Almost 50% of the victims lost their health care coverage as a result of the incident, while nearly one-third said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy.[18]

59.     In recent years, the pace of breaches within healthcare organizations has rapidly increased. According to a 2019 HIMSS Cybersecurity Survey, some 82% of participating hospital information security leaders reported having a significant security incident within the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[19] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From Social Security Numbers and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[20]

60.     Indeed, the *HIPAA Journal* 2019 Healthcare Data Breach Report demonstrates an upward trend in health sector data breaches over the past 10 years, with 2019 reflecting more data breaches than any other year.[21] 2019 represented a 37.4%

---

[17] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET, March 3, 2010, https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited October 28, 2020).

[18] *Id.*

[19] HIMSS, 2019 *HIMSS Cybersecurity Survey*, https://www.himss.org/himss-cybersecurity-survey (last visited October 28, 2020).

[20] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, available at https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited October 28, 2020).

[21] *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/health care-data-breach-statistics/ (last visited October 28, 2020).

increase over breaches reported in 2018 with a total number of patient records exposed increasing from 13,947,909 in 2018 to 41,335,889.[22] "Shockingly, the report disclosed that in 2019 alone, the healthcare records of 12.55% of the population of the United States were exposed, impermissibly disclosed, or stolen."[23]

61.     As a healthcare services provider, Magellan knew, or certainly should have known, the importance of safeguarding patient PHI and PII entrusted to it and of the foreseeable consequences if its data security systems were breached, including the significant costs that would be imposed on its employees, providers, and patients as a result of a breach.  But Magellan failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### F.     Magellan Acquires, Collects, and Stores Plaintiffs' and Class Members' PII and PHI

62.     As its Privacy Policy makes clear, Magellan Health acquires, collects, and stores a massive amount of PII on its employees, former employees, and beneficiaries.

63.     As a condition of employment, or as a condition of receiving certain benefits, Magellan Health requires that its employees and their beneficiaries entrust it with highly sensitive personal information.

64.     Defendant also required Class Members to submit non-public personal information, PII, and PHI in order to obtain medical and pharmacy services from its affiliates, and creates PHI (e.g., treatment records) in the course of providing medical and pharmacy services.

65.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII and PHI, Magellan assumed legal and equitable duties and knew or

---

[22]   *2019 Healthcare Data Breach Report*, HIPAA Journal, https://www.hipaajournal.com/2019-healthcare-data-breach-report/ (last visited October 28, 2020).

[23]   *Report Reveals Worst State for Healthcare Data Breaches in 2019*, Info Security Group, February 14, 2020, https://www.infosecurity-magazine.com/news/report-healthcare-data-breaches-in/ (last visited October 28, 2020).

should have known that it was responsible for protecting Plaintiffs' and Class Members' PII and PHI from unauthorized disclosure.

66.     At all times relevant hereto, Plaintiffs and Class Members took reasonable steps to maintain the confidentiality of their PII and PHI. Plaintiffs and Class Members relied on Magellan to keep their PII and PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### G.     The Value of Personally Identifiable Information and the Effects of Unauthorized Disclosure

67.     Personally identifiable information is a valuable commodity to identity thieves.  As the FTC recognizes, identity thieves can use it to commit an array of crimes including identify theft, medical and financial fraud.[24] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII on multiple underground Internet websites.

68.     While credit card information can sell for as little as $1-$2 on the black market, other more sensitive information can sell for as much as $363 according to the Infosec Institute. PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

69.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security Number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not

---

[24] Federal   Trade   Commission,   *Warning   Signs   of   Identity   Theft*, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited October 28, 2020).

know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

70.     Moreover, it is not an easy task to change or cancel a stolen Social Security Number. An individual cannot obtain a new Social Security Number without significant paperwork and evidence of actual misuse. Even then, a new Social Security Number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[25]

71.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[26]  As explained above, the inclusion of PHI, such as the information exposed here, is even more valuable.

72.     At all relevant times, Magellan knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences if its data security systems were breached, including, the significant costs that would be imposed on employees and providers as a result of a breach.

**H.     Magellan Failed to Comply with FTC Guidelines**

73.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data

---

[25] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited October 28, 2020).

[26] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html   (last visited October 28, 2020).

security practices. According to the FTC, the need for data security should be factored into all business decision-making.[27]

74.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[28] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

75.     The FTC further recommends that companies not maintain PHI and PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[29]

76.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

77.     Magellan failed to properly implement basic data security practices. Magellan's failure to employ reasonable and appropriate measures to protect against

---

[27] Federal Trade Commission, *Start with Security*, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited October 28, 2020).

[28] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited October 28, 2020).

[29] FTC, *Start With Security*, *supra* note 27.

23

unauthorized access to PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

78.    Magellan was at all times fully aware of its obligation to protect the PII and PHI of employees, providers and patients because of its position as an employer, contractor and healthcare provider.   Magellan was also aware of the significant repercussions that would result from its failure to do so.

**I.    Magellan Failed to Comply with Industry Standards**

79.    Data exfiltrated from healthcare providers continues to be a high value target among cybercriminals.   This is true whether the data maintained by providers relates to patients or their providers or their own employees.   In 2017, the U.S. healthcare sector experienced over 330 Data Breaches, a number which continued to grow in 2018 (363 breaches).[30] The costs of healthcare Data Breaches are among the highest across all industries, topping $380 per stolen record in 2017 as compared to the global average of $141 per record.[31] As a result, both the government and private sector have developed industry best standards to address this growing problem.

80.    The Department of Health and Human Services' Office for Civil Rights ("HHS") notes that "[w]hile all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations as they store large quantities of highly sensitive and valuable data."[32]  HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience which require a relatively small financial investment, yet can

---

[30]    Identity Theft Resource Center, *2018 End of Year Data Brach Report*, https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf (last visited October 28, 2020).

[31]    *Id.*

[32]    *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA Journal, November 1, 2018, https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/ (last visited October 28, 2020).

have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of PHI and PII; (b) educating and training healthcare employees on how to protect PHI and PII; and (c) correcting the configuration of software and network devices.

81.    Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyberattacks, both because of the value of the individuals' PHI and PII they maintain and because as an industry they have been slow to adapt and respond to cybersecurity threats.[33] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of PHI and PII.

82.    Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Magellan chose to ignore them. These best practices were known, or should have been known by Magellan, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of PII and PHI for a second time.

### J.    *Plaintiffs and Class Members Suffered Damages*

83.    The ramifications of Defendant's failure to keep employees', patients' and providers' PII and PHI secure are long lasting and severe.  Once stolen, fraudulent use of such information and damage to victims may continue for years. Consumer victims of Data Breaches are more likely to become victims of identity fraud.[34]

84.    The PII and PHI belonging to Plaintiffs and Class Members is private, sensitive in nature, and was left inadequately protected by Defendant, who did not obtain Plaintiffs' or Class Members' consent to disclose such sensitive information to any other person as required by applicable law and industry standards.

---

[33] *See, e.g.*, https://resources.infosecinstitute.com/category/healthcare-information-security/is-best-practices-for-healthcare/10-best-practices-for-healthcare-security/#gref (last visited October 28, 2020).

[34] 2014 LexisNexis True Cost of Fraud Study, https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (last visited October 28, 2020).

85.   Plaintiffs and Class Members have suffered actual injuries from having their PII and PHI exposed as a result of the Data Breach, as identified elsewhere, and including, but not limited to: (a) damages resulting from taking the time to: search for fraudulent activity; change banks, bank accounts, and debit and credit cards; purchase credit monitoring and identity theft protection; call their creditors to provide them with notice of the breach; and otherwise attempt to protect their financial accounts; (b) damages to and diminution in the value of their PII—a form of intangible property that the Plaintiffs entrusted to Magellan as a condition of employment and the provision of services to patients; (c) imminent and impending injury arising from the increased risk of fraud and identity theft; and (d) in other ways to be discovered and proven at trial.

86.   As a result of the Data Breach, Plaintiffs and Class Members will continue to be at heightened risk for financial fraud, medical fraud, identity theft, and attendant damages for years, if not decades, to come.

87.   The Data Breach was a direct and proximate result of Magellan's failure to: (a) properly safeguard and protect Plaintiffs' and Class Members' PII and PHI from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII and PHI; (c) protect against reasonably foreseeable threats to the security or integrity of such information; and (d) do other things to be discovered and proven at trial.

88.   Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately invest in data security measures, despite its obligations to protect PII and PHI.  Had Defendant remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, especially given the previous breach, it would have certainly prevented the intrusions into its systems and, ultimately, the theft of PII and PHI here.

89.     As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take time away from other life demands such as work and family to mitigate the actual and potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[35]

90.     To date, Magellan has offered inadequate identity monitoring services to affected individuals given the type of data stolen.  They are wholly inadequate as they fail to provide for the fact that victims of Data Breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' PII and PHI.

91.     As a result of the Defendant's failures to prevent the Data Breach, Plaintiffs and Class Members have suffered, will suffer, or are at increased risk of suffering:

      a.  The compromise, publication, theft, and/or unauthorized use of their PII and PHI;

      b.  Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

      c.  Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching

---

[35] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013 https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited October 28, 2020).

how to prevent, detect, contest, and recover from identity theft and fraud;

d. The continued risk to their PII and PHI, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the PII and PHI in its possession; and

e. Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

92.     In addition to a remedy for the economic harm, Plaintiffs and Class Members maintain an undeniable interest in ensuring that their PII and PHI are secure, remain secure, and are not subject to further misappropriation and theft.

93.     Had Defendant remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into its systems and, ultimately, the theft of PII and PHI.

94.     The United States Government Accountability Office released a report in 2007 regarding Data Breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[36]

95.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a Data Breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting

---

[36] *See Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. Government Accountability Office, June 2007, *2, https://www.gao.gov/new.items/d07737.pdf (last visited October 28, 2020) ("GAO Report").

companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[37]

96.    Identity thieves use stolen personal information such as Social Security Numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

97.    Identity thieves can also use Social Security Numbers to, *inter alia*, obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[38]

---

[37]  *See* https://www.identitytheft.gov/Steps (last visited October 28, 2020).

[38]    Jason Steele, *Credit Card and ID Theft Statistics,* October 24, 2017, https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited last visited October 28, 2020).



Americans' expenses/disruptions as a result of criminal activity in their name [2016]

| | |
|---|---|
| I had to request government assistance | 29.5% |
| I had to borrow money | 60.7% |
| Had to use my savings to pay for expenses | 32.8% |
| Couldn't qualify for a home loan | 32.8% |
| I lost my home/place of residence | 31.1% |
| I couldn't care for my family | 34.4% |
| Had to rely on family/friends for assistance | 49.2% |
| Lost out on an employment opportunity | 44.3% |
| Lost time away from school | 19.7% |
| Missed time away from work | 55.7% |
| Was generally inconvenienced | 73.8% |
| Other | 23% |
| None of these | 3.3% |

Source: Identity Theft Resource Center          creditcards.com

98.     What's more, PII constitutes a valuable property right, the theft of which is gravely serious.[39] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences.  Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

99.     It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and between when PII and/or financial information is stolen and when it is used.  According to the U.S. Government Accountability Office, which conducted a study regarding Data Breaches:

[L]aw enforcement officials told us that in some cases, stolen data

---

[39]  *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets") (citations omitted).

may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from Data Breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

100.    PII and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

101.    There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial accounts for many years to come.

## CLASS ACTION ALLEGATIONS

102.    Plaintiffs seek relief on behalf of themselves and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of a Nationwide class defined as follows:

> The Nationwide Class: All persons whose PII and/or PHI was compromised as a result of the Ransomware Attack that Magellan Health discovered on or about April 11, 2020.

103.    Alternatively, Plaintiffs propose the following definitions for the following subclasses of Class Members (collectively, "Subclasses");

> The Arizona Class: All persons residing in Arizona whose PII and/or PHI was compromised as a result of the Ransomware Attack that Magellan Health discovered on or about April 11, 2020.

> The California Class: All persons residing in California whose PII and/or PHI was compromised as a result of the Ransomware Attack that Magellan Health discovered on or about April 11, 2020.

> The Florida Class: All persons residing in Florida whose PII and/or PHI was compromised as a result of the Ransomware Attack that Magellan Health discovered on or about April 11, 2020.

The Missouri Class: All persons residing in Missouri whose PII and/or PHI was compromised as a result of the Ransomware Attack that Magellan Health discovered on or about April 11, 2020.

The New York Class: All persons residing in New York whose PII and/or PHI was compromised as a result of the Ransomware Attack that Magellan Health discovered on or about April 11, 2020.

The Pennsylvania Class: All persons residing in Pennsylvania whose PII and/or PHI was compromised as a result of the Ransomware Attack that Magellan Health discovered on or about April 11, 2020.

The Virginia Class: All persons residing in Virginia whose PII and/or PHI was compromised as a result of the Ransomware Attack that Magellan Health discovered on or about April 11, 2020.

The Wisconsin Class: All persons residing in Wisconsin whose PII and/or PHI was compromised as a result of the Ransomware Attack that Magellan Health discovered on or about April 11, 2020.

The Employee Class: All current and former employees of Magellan whose PII and/or PHI was compromised as a result of the Ransomware Attack that Magellan Health discovered on or about April 11, 2020.

104.    Excluded from the Class are Magellan and any of its affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

105.    Plaintiffs hereby reserve the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

106.    The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3), and (c)(4).

107.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous that the joinder of all members is impractical. The Data Breach implicates approximately 10,500 Magellan employees, both current

and former, as well as a potentially unknown number of Magellan providers and other health plan participants.

108.   **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a.   Whether Magellan had a duty to protect its employees', providers' and patients' sensitive PII and PHI;

b.   Whether Magellan knew or should have known of the susceptibility of its systems to a Data Breach;

c.   Whether Magellan's security measures to protect its systems were reasonable considering best practices recommended by data security experts;

d.   Whether Magellan was negligent in failing to implement reasonable and adequate security procedures and practices;

e.   Whether Magellan's failure to implement adequate data security measures allowed the breach of its data systems to occur;

f.   Whether Magellan's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the unlawful exposure of the Plaintiffs' and Class Members' PII and PHI;

g.   Whether Plaintiffs and Class Members were injured and suffered damages or other losses because of Magellan's failure to reasonably protect its systems and data network; and,

h.   Whether Plaintiffs and Class Members are entitled to relief.

109.   **Typicality. Fed. R. Civ. P. 23(a)(3).**  Consistent with Rule 23(a)(3), Plaintiffs' claims are typical of those of other Class Members.  Plaintiffs were former and current employees of various Magellan entities, providers and other persons

believed to work on a 1099 basis with a Magellan entity – all of whom had their PII exposed in the Data Breach and members of various health plans serviced by Magellan. Plaintiffs' damages and injuries are akin to other Class Members, and Plaintiffs seek relief consistent with the relief sought by the Class.

110. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because they are members of the Class they seek to represent; are committed to pursuing this matter against Magellan to obtain relief for the Class; and have no conflicts of interest with the Class. Moreover, Plaintiffs' attorneys are competent and experienced in litigating class actions, including privacy litigation of this kind. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class' interests.

111. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Magellan, and thus, individual litigation to redress Magellan's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

112. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to

act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

113.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

   a.   Whether Magellan owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII and PHI;

   b.   Whether Magellan's security measures to protect its data systems were reasonable considering best practices recommended by data security experts;

   c.   Whether Magellan's failure to institute adequate protective security measures amounted to negligence;

   d.   Whether Magellan failed to take commercially reasonable steps to safeguard employee, provider and patient PII and PHI;

   e.   Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach; and

   f.   Whether Magellan failed to comply with its statutory and regulatory obligations.

114.   Finally, all members of the proposed Class are readily ascertainable. Magellan has access to its employees', providers' and patients' names and addresses affected by the Data Breach. Using this information, Class Members can be identified and ascertained for the purpose of providing notice.

/ / /

/ / /

/ /

# FIRST CAUSE OF ACTION
## NEGLIGENCE

*(On Behalf of all Plaintiffs, the Nationwide Class, and all Subclasses)*

115.    Plaintiffs restate and reallege paragraphs 1 through 114 as if fully set forth herein.

116.    Defendant Magellan Health required Plaintiffs and Class Members to submit non-public PII as a condition of employment, or as a condition of receiving employee benefits, or as a condition of receiving medical or pharmaceutical care.

117.    Plaintiffs and all Class Members entrusted their PII and PHI to Magellan Health with the understanding that the Defendant would safeguard their information.

118.    Magellan Health had full knowledge of the sensitivity of this PII and PHI and the types of harm that Plaintiffs and Class Members could and would suffer if such information was wrongfully disclosed.

119.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' PII and PHI held within it—to prevent disclosure of the information, and to safeguard the information from theft.  Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

120.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

121.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative,

technical, and physical safeguards to protect the privacy of protected health information."
45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case
constitutes "protected health information" within the meaning of HIPAA.

122. Defendant's duty to use reasonable care in protecting confidential data
arose not only as a result of the statutes and regulations described above, but also because
Defendant is bound by industry standards to protect confidential PII and PHI.

123. Defendant breached its duties, and thus was negligent and/or grossly
negligent, by failing to use reasonable measures to protect Class Members' PII and PHI.
The specific negligent acts and omissions committed by Defendant include, but are not
limited to, the following:

    a. Failing to adopt, implement, and maintain adequate security measures to
       safeguard Class Members' PII and PHI;

    b. Failing to adequately monitor the security of its networks and systems;

    c. Failing to periodically ensure that its email system had plans in place to
       maintain reasonable data security safeguards;

    d. Allowing unauthorized access to Class Members' PII and PHI;

    e. Failing to detect in a timely manner that Class Members' PII and PHI had
       been compromised; and

    f. Failing to timely notify Class Members about the Data Breach so that they
       could take appropriate steps to mitigate the potential for identity theft and
       other damages.

124. It was foreseeable that Defendant's failure to use reasonable measures to
protect Class Members' PII and PHI would result in injury to Class Members. Further,
the breach of security was reasonably foreseeable given the known high frequency of
cyberattacks and Data Breaches in the data storage and healthcare industries.

125. It was therefore foreseeable that the failure to adequately safeguard Class
Members' PII and PHI would result in one or more types of injuries to Class Members.

126.   There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and PHI and the harm suffered, or risk of imminent harm suffered by Plaintiffs and the Class.

127.   Plaintiffs and the Class Members had no ability to protect their PHI and PII that was in Defendant's possession.

128.   Defendant was able to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

129.   Defendant had a duty to put proper procedures in place in order to prevent the unauthorized dissemination of Plaintiffs' and Class Members' PHI and PII.

130.   Defendant admitted that Plaintiffs' and Class Members' PII and PHI was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

131.   As a result of Defendant's negligence and/or gross negligence, Plaintiffs and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, including the costs associated therewith; time spent monitoring, addressing and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

132.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

133.   Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen their data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

/ / /

/ / /

/ / /

/ / /

/ /

1

2

## SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*

3

*(On Behalf of all Plaintiffs, the Nationwide Class, and all Subclasses)*

4

134.   Plaintiffs restate and reallege paragraphs 1 through 114 as if fully set forth

5

herein.

6

135.   Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Defendant

7

had a duty to provide fair and adequate computer systems and data security practices to

8

safeguard Plaintiffs' and Class Members' PII and PHI.

9

136.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting

10

commerce," including, as interpreted and enforced by the FTC, the unfair act or practice

11

by businesses, such as Defendant's, of failing to use reasonable measures to protect PII

12

and PHI. The FTC publications and orders described above also form part of the basis of

13

Defendant's duty in this regard.

14

137.   Defendant violated Section 5 of the FTC Act by failing to use reasonable

15

measures to protect employee and patient PII and PHI and not complying with applicable

16

industry standards, as described in detail herein. Defendant's conduct was particularly

17

unreasonable given the nature and amount of PII and PHI it obtained and stored, and the

18

foreseeable consequences of a Data Breach including, specifically, the damages that

19

would result to Plaintiffs and Class Members.

20

138.   Defendant's violation of Section 5 of the FTC Act constitutes negligence

21

*per se* as Defendant's violation of the FTC Act establishes the duty and breach elements

22

of negligence.

23

139.   Plaintiffs and Class Members are within the class of persons that the FTC

24

Act was intended to protect.

25

140.   The harm that occurred as a result of the Data Breach is the type of harm

26

the FTC Act was intended to guard against. The FTC has pursued enforcement actions

27

against businesses, which, as a result of their failure to employ reasonable data security

28

measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

141.   Pursuant to the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), Defendant had a duty to protect the security and confidentiality of Plaintiffs' and Class Members' PII.

142.   Defendant breached its duties to Plaintiffs and Class Members under the Gramm-Leach-Bliley Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

143.   Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq*., Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

144.   Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." See definition of encryption at 45 C.F.R. § 164.304.

145.   Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

146.   But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

147.   The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their PII.

148.   As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

149.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**

*(On Behalf of all Plaintiffs, the Nationwide Class, and all Subclasses)*

150.    Plaintiffs restate and reallege paragraphs 1 through 114 as if fully set forth herein.

151.    Plaintiffs and Class Members were required to provide their PII and PHI to Defendant as a condition of their use of Defendant's services, or as a condition of employment.

152.    Plaintiffs and Class Members paid money to Defendant and disclosed their PII and PHI in exchange for medical and pharmaceutical services, along with Defendant's promise to protect their PII and PHI from unauthorized disclosure.

153.    Plaintiffs also provided their labor and employee services to Defendant, as well as turning over their PII to Defendant, in exchange for Defendant's promise to protect their PII from unauthorized disclosure.

154.    In its written privacy policies, Defendant Magellan Health expressly promised Plaintiffs and Class Members that it would only disclose PII or PHI under certain circumstances, none of which relate to the Data Breach.

155.    Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' PII and PHI would remain protected.

156.    Implicit in the agreement between Plaintiffs and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only; (b) take reasonable steps to safeguard that PII; (c) prevent unauthorized disclosures of the PII; (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII; (e)

41

reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses; and (f) retain the PII only under conditions that kept such information secure and confidential.

157.   When Plaintiffs and Class Members provided their PII to Defendant Magellan Health as a condition of their employment or employee beneficiary status, or as a condition precedent to receiving medical or pharmaceutical care, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

158.   Defendant solicited, invited, and then required Class Members to provide their PII and PHI as part of Defendant's regular business practices.  Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.

159.   In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

160.   Plaintiffs and Class Members would not have entrusted their PII and PHI to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.  Plaintiffs and Class Members would not have entrusted their PII and PHI to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

161.   Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

162.   Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII and PHI.

163.   As a direct and proximate result of Defendant' breaches of the implied contracts, Class Members sustained damages as alleged herein.

164.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

165.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

## FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT

*(On Behalf of all Plaintiffs, the Nationwide Class, and all Subclasses)*

166.    Plaintiffs restate and reallege paragraphs 1 through 114 as if fully set forth herein.

167.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Part of the premiums that health plan participant Plaintiffs and Class Members paid to Defendant (or that were paid to Defendant on behalf of the health plan participant Plaintiffs and Class Members) were intended to be used by Defendant to fund adequate security of Defendant's computer property and Plaintiffs and Class Members' Private Information and protect Plaintiffs and Class Members' Private Information.  Employee Plaintiffs and Class Members conferred the benefit of their labor on Defendant, and part of that benefit conferred was intended to be used by Defendant to fund adequate security of Defendant's computer property and employee Plaintiffs and Class Members' Private Information and protect Plaintiffs and Class Members' Private Information.

168.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information.  Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant' decision to prioritize its own profits over the requisite security.

43

169.   Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

170.   Defendant acquired the PII and PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

171.   If Plaintiffs and Class Members knew that Defendant had not secured their PII and PHI, they would not have agreed to provide their PII and PHI to Defendant Magellan Health.

172.   Plaintiffs and Class Members have no adequate remedy at law.

173.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity to direct how their PII and PHI are used; (c) the compromise, publication, and/or theft of their PII and PHI; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII and PHI; (e) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII and PHI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII and PHI in its continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII and PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

174.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

175.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that it unjustly received from them.

176.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

### FIFTH CAUSE OF ACTION
### ARIZONA CONSUMER FRAUD ACT ("ACFA")
### Ariz. Rev. Stat. §§ 44-1521, *et seq.*

*(On Behalf of all Plaintiffs, the Nationwide Class, and the Arizona Subclass)*

177.    Plaintiffs restate and reallege paragraphs 1 through 114 as if fully set forth herein.

178.    The ACFA provides in pertinent part:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in face been misled, deceived or damaged thereby, is declared to be an unlawful practice.

*Id.* § 44-1522.

179.    Plaintiffs and Class Members are "persons" as defined by Ariz. Rev. Stat. § 44-1521(6).

180.    Defendant Magellan Health provides "services" as that term is included in the definition of "merchandise" under Ariz. Rev. Stat. § 44-1521(5), and Defendant is engaged in the "sale" of "merchandise" as defined by Ariz. Rev. Stat. § 44-1521(7).

181. Magellan engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the ACFA) in violation of the ACFA, including but not limited to the following:

    a.  Failing to maintain sufficient security to keep Plaintiffs' and Class Members' confidential financial and personal data from being hacked and stolen;

    b.  Failing to disclose the Data Breach to Class Members in a timely and accurate manner, in violation of Ariz. Rev. Stat. § 18-552(B);

    c.  Misrepresenting material facts, pertaining to maintaining adequate data privacy and security practices and procedures to safeguard Class Members' PII and PHI from unauthorized disclosure, release, Data Breaches, and theft;

    d.  Misrepresenting material facts, in connection with the sale of health benefit services by representing that it did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Class Members' PHI and PII;

    e.  Omitting, suppressing, and concealing the material fact of the inadequacy of the data privacy and security protections for Class Members' PHI and PII;

    f.  Engaging in unfair, unlawful, and deceptive acts and practices with respect to the sale of health benefit services by failing to maintain the privacy and security of Class Members' PHI and PII, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Data Breach. These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws, including HIPAA and Section 5 of the FTC Act;

    g.  Engaging in unlawful, unfair, and deceptive acts and practices with

respect to the sale of health benefit services by failing to disclose the Data Breach to Class Members in a timely and accurate manner; and

h. Engaging in unlawful, unfair, and deceptive acts and practices with respect to the sale of health benefit services by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Class Members' PHI and PII from further unauthorized disclosure, release, Data Breaches, and theft.

182.   The above unlawful, unfair, and deceptive acts and practices by Magellan were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

183.   Magellan knew or should have known that its computer systems and data security practices were inadequate to safeguard Class Members' PII and PHI and that risk of a Data Breach or theft was high. Magellan's actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Members of the Class.

184.   As a direct and proximate result of Magellan's deceptive acts and practices, the Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their PII and PHI.

185.   Plaintiffs and Class Members seek relief under the ACFA including, but not limited to, injunctive relief, actual damages, treble damages for each willful or knowing violation, and attorneys' fees and costs.

186.   Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

/ /

## SIXTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

*(On Behalf of Plaintiff Ranson and the California Subclass)*

187.   Plaintiffs restate and reallege paragraphs 1 through 114 as if fully set forth herein.

188.   Magellan Health is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

189.   Magellan Health violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

190.   Magellan Health's unlawful, unfair acts and deceptive acts and practices include:

a.   Magellan Health failed to implement and maintain reasonable security measures to protect Plaintiff's and California Class Members' PII and PHI from unauthorized disclosure, release, Data Breaches, and theft, which was a direct and proximate cause of the Data Breach;

b.   Magellan Health failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following at least one previous cybersecurity incident within the last year. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiff and California Class Members whose PII and PHI has been compromised;

c.   Magellan Health's failure to implement and maintain reasonable security measures also was contrary to legislatively declared public policy that seeks to protect consumer data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. §

45, California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 *et seq.*, and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*;

d. Magellan Health's failure to implement and maintain reasonable security measures also lead to substantial injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because Plaintiff and California Class Members could not know of Magellan Health's inadequate security, consumers could not have reasonably avoided the harms that Magellan Health caused;

e. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and the California Class Members' PII, including by implementing and maintaining reasonable security measures;

f. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and the California Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C § 45; California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*; and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*;

g. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and the California Class Members' PII;

h. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and the California Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C § 45; California's Customer Records Act, Cal. Civ. Code §§

1798.80, *et seq.*; and California's Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.*;

    i.    Engaging in unlawful business practices by violating Cal. Civ. Code § 1798.82; and

    j.    Among other ways to be discovered and proved at trial.

191.    Magellan Health representations and omissions to Plaintiff and California Class Members were material because they were likely to deceive reasonable consumers about the adequacy of Magellan Health's data security and ability to protect the confidentiality of consumers' PII and PHI.

192.    Magellan Health intended to mislead Plaintiff and the California Class Members and induce them to rely on its misrepresentations and omissions.

193.    Had Magellan Health disclosed to Plaintiff and the California Class Members that its data systems were not secure and, thus, vulnerable to attack, Magellan Health would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Magellan Health received, maintained, and compiled Plaintiff's and the California Class Members' PII and PHI as part of the services and goods Magellan Health provided without advising Plaintiff and the California Class Members that Magellan Health's data security practices were insufficient to maintain the safety and confidentiality of Plaintiff's and the California Class Members' PII and PHI. Accordingly, Plaintiff and the California Class Members acted reasonably in relying on Magellan Health's misrepresentations and omissions, the truth of which they could not have discovered.

194.    Magellan Health acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and the California Class Members' rights, especially given that a similar attack had occurred some 11 months previously.

195.    As a direct and proximate result of Magellan Health's unfair, unlawful, and fraudulent acts and practices, Plaintiff and California Class Members have suffered and

will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages as described herein and as will be proved at trial. These losses include the diminished value of Plaintiff's and California Class Members' PII and PHI. Because the integrity of Plaintiff's and California Class Members' PII is crucial to their future ability to engage in many aspects of commerce, including obtaining a mortgage, credit card, business loan, tax return, or even applying for a job, the diminishment of the integrity of that PII and PHI corresponds to a diminishment in value. In other words, Plaintiff and California Class Members have both present and future property interest diminished as a result of Magellan Health's unfair, unlawful, and fraudulent acts and practices.

196.    Plaintiff and California Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Magellan Health's unfair, unlawful, and fraudulent business practices or use of their PII; declaratory relief; injunctive relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; and other appropriate equitable relief.

197.    Plaintiff and California Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all California Class Members.

## SEVENTH CAUSE OF ACTION
## VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT, CAL. CIV. CODE §§ 1798.100, et seq. (§ 1798.150(a))

(*On Behalf of Plaintiff Ranson and the California Subclass*)

198.    Plaintiff restates and realleges paragraphs 1 through 114 as if fully set forth herein.

199.    Magellan Health is a "business" as defined by Cal. Civ. Code § 1798.140(c).

200.   Plaintiff Ranson and California Class Members are "consumers" as defined by Cal. Civ. Code § 1798.140(g).

201.   Plaintiff Ranson's and California Class Members' PII and PHI constitutes "personal information" as defined by Cal. Civ. Code 1798.81.5(d)(1)(A).

202.   Magellan Health "collects" consumers' PII and PHI, including the PHI and PII of Plaintiff Ranson and California Class Members, as defined by Cal. Civ. Code § 1798.140(e).

203.   Magellan Health violated section 1798.150(a) of the California Consumer Privacy Act ("CCPA") by failing to prevent Plaintiff Ranson's and California Class Members' nonencrypted and nonredacted PII and PHI from unauthorized access and exfiltration, theft, or disclosure as a result of Magellan Health's violations of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the PII and PHI.

204.   As a direct and proximate result of Magellan Health's violation of its duty, Plaintiff Ranson's and California Class Members' PII and PHI was subjected to an unauthorized access and exfiltration, theft, or disclosure.

205.   As a direct and proximate result of Magellan Health's violation of its duty, Plaintiff Ranson and California Class Members were injured and lost money or property as described herein and as will be proved at trial.

206.   Magellan Health knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiff Ranson's and California Class Members' PHI and PII entrusted to it, and that risk of a data breach or theft was highly likely.

207.   Pursuant to section 1798.150(b) of the CCPA, by this Complaint, Plaintiff Ranson has given written notice to Magellan Health of its violations of section 1798.150(a).  If Magellan Health fails to "actually cure" its violations and provide "an express written statement that the violations have been cured and that no further

violations shall occur" within 30 days of Plaintiff's written notice, Plaintiff Ranson will amend this Complaint to seek statutory damages on a class-wide basis.

208.   Plaintiff Ranson and California Class Members seek relief under § 1798.150(a), including, but not limited to injunctive or declaratory relief; any other relief the Court deems proper; and attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

## EIGHTH CAUSE OF ACTION
### VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT ("MMPA")
### MO. REV. STAT. § 407.010, *et seq*.

*(On Behalf of Plaintiff Griffey and the Missouri Subclass)*

209.   Plaintiffs restate and reallege paragraphs 1 through 114 as if fully set forth herein.

210.   Magellan Health, Plaintiff and the Missouri Class are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

211.   Healthcare services are a good.

212.   Efforts to maintain the privacy and confidentiality of medical records are part of the healthcare services associated with a good.

213.   Maintenance of medical records are "merchandise" within the meaning of section 407.010(4).

214.   As set forth herein, Defendant's acts, practices and conduct violate section 407.020(1) in that, among other things, Defendant has used and/or continues to use unfair practices, concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of services associated with healthcare services.

215.   Defendant's unfair, unlawful and deceptive acts, practices, and conduct include: (a) representing to its patients that it will not disclose their sensitive personal health information to an unauthorized third party or parties; (b) failing to implement

53

security measures such as securing the records in a safe place; and (c) failing to train personnel. Defendant's conduct violates the MMPA.

216.    Defendant's conduct also violates the enabling regulations for the MMPA because it: (a) offends public policy; (b) is unethical, oppressive, and unscrupulous; (c) causes substantial injury to consumers; (d) is not in good faith; (e) is unconscionable; and (f) is unlawful. See Mo. Code Regs. Ann. tit. 15, § 60-8.

217.    As a direct and proximate result of Defendant's unfair and deceptive acts, Plaintiff and Missouri Class Members have suffered damages in that they (a) paid more for medical record privacy protections than they otherwise would have, and (b) paid for medical record privacy protections that they did not receive. In this respect, Plaintiff and Missouri Class Members have not received the benefit of their bargain, and have suffered an ascertainable loss.

218.    As such, Plaintiff and Missouri Class Members are entitled to seek actual damages from Defendant; a declaration that Defendant's methods, acts and practices violate the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.*, an injunction prohibiting Defendant from continuing to engage in such unlawful methods, acts, and practices; restitution; rescission; disgorgement of all profits obtained from Defendant's unlawful conduct; pre and post-judgment interest; attorneys' fees and costs; and any other relief that the Court deems necessary or proper.

219.    Plaintiff and Missouri Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Missouri Class Members.

/ / /

/ / /

/ / /

/ /

### NINTH CAUSE OF ACTION
### VIOLATION OF NEW YORK
### GENERAL BUSINESS LAW § 349

*(On Behalf of Plaintiff Leather and the New York Subclass)*

220.   Plaintiffs restate and reallege paragraphs 1 through 114 as if fully set forth herein.

221.   Defendant engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce and furnishing of services, in violation of N.Y. Gen. Bus. Law § 349(a), including but not limited to the following:

    a.   Defendant misrepresented material facts to Plaintiff and the Class by representing that it would maintain adequate data privacy and security practices and procedures to safeguard Plaintiff and New York Class Members' PHI and PII from unauthorized disclosure, release, Data Breaches, and theft;

    b.   Defendant misrepresented material facts to Plaintiff and the New York Subclass by representing that it did and would comply with the requirements of federal and state laws pertaining to the privacy and security of New York Class Members' PHI and PII;

    c.   Defendant omitted, suppressed and concealed material facts of the inadequacy of its privacy and security protections for Plaintiff's and New York Class Members' PHI and PII;

    d.   Defendant engaged in deceptive, unfair, and unlawful trade acts or practices by failing to maintain the privacy and security of Plaintiff's New York Class Members' PHI and PII, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Data Breach. These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45); and

e. Defendant engaged in deceptive, unfair, and unlawful trade acts or practices by failing to disclose the Data Breach to Plaintiff and the Class in a timely and accurate manner, contrary to the duties imposed by N.Y. Gen. Bus. Law § 899-aa(2). At all times relevant herein, Plaintiff Leather and members of the New York Class were residents of the State of New York and were deceived in New York by the misconduct alleged herein.

222.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiff's and the New York Class Members' PHI and PII entrusted to it, and that risk of a Data Breach or theft was highly likely.

223.    Defendant should have disclosed this information because Defendant was in a superior position to know the true facts related to the defective data security.

224.    Defendant's failure constitutes false and misleading representations, which have the capacity, tendency, and effect of deceiving or misleading consumers (including Plaintiff and New York Class Members) regarding the security of Magellan Health's network and aggregation of PHI and PII.

225.    The representations upon which consumers (including Plaintiff and New York Class Members) relied were material representations (*e.g.*, as to Defendant's adequate protection of PHI and PII), and consumers (including Plaintiff and New York Class Members) relied on those representations to their detriment.

226.    Defendant's conduct is unconscionable, deceptive, and unfair, as it is likely to, and did, mislead consumers acting reasonably under the circumstances. As a direct and proximate result of Defendant's conduct, Plaintiff and other New York Class Members have been harmed, in that they were not timely notified of the Data Breach, which resulted in profound vulnerability to their personal information and other financial accounts.

227.   As a direct and proximate result of Defendant's unconscionable, unfair, and deceptive acts and omissions, Plaintiff's and New York Class Members' PHI and PII was disclosed to third parties without authorization, causing and will continue to cause Plaintiff and Class Members damages, as well as to the public interest and consumers at large in New York.

228.   Plaintiff and New York Class Members seek relief under N.Y. Gen. Bus. Law § 349(h), including, but not limited to, actual damages, treble damages, statutory damages, injunctive relief, and/or attorney's fees and costs.

229.   Plaintiff and New York Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all New York Class Members.

<u>**TENTH CAUSE OF ACTION**</u>
**VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, *et seq.*)**

*(On Behalf of Plaintiff Domingo and the Pennsylvania Subclass)*

230.   Plaintiff restates and realleges paragraphs 1 through 114 as if fully set forth herein.

231.   Plaintiff and Defendant are "persons" as defined at 73 Pa. Stat. § 201-2(2).

232.   Plaintiff and Pennsylvania Class Members purchased goods and services in "trade" and "commerce" as defined at 73 Pa. Stat. § 201-2(3).

233.   Plaintiff and Pennsylvania Class Members purchased goods and services primarily for personal, family, and/or household purposes under 73 Pa. Stat. § 201-9.2.

234.   Magellan Health engaged in "unfair methods of competition" or "unfair or deceptive acts or practices" as defined at 73 Pa. Stat. § 201-2(4) by, among other things, engaging in the following conduct:

a.   Representing that its goods and services had characteristics, uses, benefits, and qualities that they did not have – namely that its goods, services, and business practices were accompanied by adequate data security (73 Pa. Stat. § 201-2(4)(v));

b.   Representing that its goods and services were of a particular standard or quality when they were of another standard or quality (73 Pa. Stat. § 201-2(4)(vii));

c.   Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. § 201-2(4)(ix); and

d.   "Engaging in any other … deceptive conduct which creates a likelihood of confusion or of misunderstanding" (73 Pa. Stat. § 201-2(4)(xxi)).

235.   These unfair methods of competition and unfair or deceptive acts or practices are declared unlawful by 73 Pa. Stat. § 201-3.

236.   Magellan Health's unfair or deceptive acts and practices include but are not limited to: failing to implement and maintain reasonable data security measures to protect Plaintiff's and Pennsylvania Class Members' PII and PHI; failing to identify foreseeable data security risks and remediate the identified risks; failing to comply with common law duties, industry standards including FTC guidance regarding data security; misrepresenting in its Privacy Policy that it would protect Plaintiff's and Pennsylvania Class Members' PII and PHI from unauthorized disclosure; and omitting and concealing the material fact that it did not have reasonable measures in place to safeguard such data from thieves stealing it.

237.   Magellan Health's representations and omissions were material because they were likely to deceive reasonable consumers including Plaintiff and Pennsylvania Class Members about the adequacy of Magellan Health's data security practices and ability to protect their PII and PHI.

238.   Magellan Health intended to mislead Plaintiff and Pennsylvania Class Members and induce them to rely on its misrepresentations and omissions. Plaintiff and

Pennsylvania Class Members did rely on Magellan Health's misrepresentations and omissions relating to its data privacy and security.

239.   Plaintiff and Pennsylvania Class Members acted reasonably in relying on Magellan Health's misrepresentations and omissions, the truth of which they could not have discovered with reasonable diligence.

240.   Had Magellan Health disclosed to Plaintiff and Pennsylvania Class Members that its data security systems were not secure and, thus, were vulnerable to attack, Plaintiff and Pennsylvania Class Members would not have given their data to Magellan Health.

241.   Magellan Health acted intentionally, knowingly, and maliciously in violating the Pennsylvania UTPCPL, and recklessly disregarded consumers' rights.

242.   As a direct and proximate result of Magellan Health's unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and Pennsylvania Class Members have suffered and will continue to suffer damages, injury, ascertainable losses of money or property, and monetary and non-monetary damages as described above.

243.   Plaintiff and Pennsylvania Class Members seek relief under 73 Pa. Stat. § 201-9.2, including, but not limited to, actual damages, treble damages, statutory damages, injunctive relief and/or attorney's fees and costs.

244.   Plaintiff and Pennsylvania Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Pennsylvania Class Members.

/ / /

/ / /

/ / /

/ / /

/ /

## ELEVENTH CAUSE OF ACTION
### VIOLATION OF VIRGINIA PERSONAL INFORMATION BREACH NOTIFICATION ACT, VA. CODE. ANN. § 18.2-186.6, *et seq.*

*(On Behalf of Plaintiff Flanders and the Virginia Subclass)*

245.    Plaintiff restates and realleges paragraphs 1 through 114 as if fully set forth herein.

246.    Defendant is required to accurately notify Plaintiff Mitchell Flanders and all Virginia Class Members without unreasonable delay under Va. Code Ann. § 18.2-186.6(B) following discovery or notification of a breach of its data security systems if unencrypted or unredacted PII and PHI was or is reasonably believed to have been accessed and acquired by an unauthorized person and causes, or Defendant reasonably believes has caused or will cause, identify theft or another fraud to Plaintiff Mitchell Flanders and/or any member of the Virginia Subclass.

247.    The Defendant and its subsidiaries are entities that own, license, or maintain computerized data that includes Personal Information as defined by Va. Code Ann. §§ 18.2-186.6(B), (D).

248.    Plaintiff's and Virginia Class Members' PII and PHI includes Personal Information as covered under Va. Code Ann. § 18.2-186.6(A).

249.    Because Defendant discovered a breach of its security systems in which unencrypted or unredacted PII and PHI was or is reasonably believed to have been accessed and acquired by an unauthorized person, who will, or who it is reasonably believed will, engage in identify theft or another fraud, Defendant had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Va. Code Ann. §§ 18.2-186.6(B), (D).

250.    By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated Va. Code Ann. §§ 18.2-186.6(B), (D).

251.    As a direct and proximate result of Defendant's violations of Va. Code Ann. §§ 18.2-186.6(B), (D), Plaintiff Mitchell Flanders and Virginia Class Members suffered damages, as described above.

252.   Plaintiff Mitchell Flanders and Virginia Class Members seek relief under Va. Code Ann. § 18.2-186.6(I), including actual damages, injunctive relief, attorney's fees and costs, and all relief determined appropriate by the Court.

253.   Plaintiffs and Virginia Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Virginia Class Members.

## TWELFTH CAUSE OF ACTION
## VIOLATION OF WISCONSIN DECEPTIVE TRADE PRACTICES ACT ("DTPA"), WIS. STAT. § 100.18(1)

*(On Behalf of Plaintiff Rivera and the Wisconsin Subclass)*

254.   Plaintiffs restate and reallege paragraphs 1 through 114 as if fully set forth herein.

255.   Defendant Magellan Health is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

256.   Plaintiff and Wisconsin Class Members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

257.   Plaintiff and Wisconsin Class Members were deceived as described herein and have suffered damages as a result of Magellan's unfair and deceptive trade practices, as complained of herein.

258.   In addition, Magellan Health operating in Wisconsin, willfully failed to disclose and did actively conceal its inadequate computer and data security discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.

259.   By failing to disclose that its computer and data systems were inadequately secured and that it lacked sufficiently robust cyber-security protocols, Magellan Health engaged in deceptive business practices in violation of Wis. Stat. § 100.18.

260. Magellan Health's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Wisconsin Class Members, about the true nature of its computer and data security and the quality of the Magellan Health brand.

261. Magellan Health intentionally and knowingly misrepresented material facts regarding the security and integrity of its data systems cyber-security protocols with an intent to mislead Plaintiff and Wisconsin Class Members.

262. Magellan Health knew or should have known that its conduct violated Wis. Stat. § 100.18.

263. As alleged above, Magellan Health made material statements about its cyber-security protocols, the integrity of its data systems, and the maintenance of PII that were either false or misleading.

264. Magellan Health owed Plaintiff and Wisconsin Class Members a duty to disclose the true nature of the security of its computer and data systems and robustness of its cyber-security protocols and practices because Magellan Health:

   a. Possessed exclusive knowledge regarding the lack of security of its employees' PII;

   b. Intentionally concealed the foregoing from Plaintiff and Wisconsin Class Members; and/or

   c. Made incomplete representations about the security and integrity of its computer and data systems and cyber-security practices.

265. Magellan Health's fraudulent claims of computer and data security and the true nature of the security of such systems were material to Plaintiff and Wisconsin Class Members.

266. Plaintiff and Wisconsin Class Members suffered ascertainable loss caused by Magellan Health's misrepresentations and its concealment of and failure to disclose material information. Wisconsin Class Members would not have had their PII

compromised and would have taken steps to prevent identity theft and other harms, but for Magellan Health's violations described herein.

267.     Magellan Health had an ongoing duty to all Magellan Health's employees – past and present – as well as members who received benefits from any one of the health plans that is administered, to refrain from unfair and deceptive practices under Wis. Stat. § 100.18.

268.     All Wisconsin Class Members suffered ascertainable loss, including in the form of out of pocket expenses and lost time to implement and maintain credit freezes and identity theft prevention as a result of Magellan Health's deceptive and unfair acts and practices made in the course of its business.

269.     Magellan Health's violations present a continuing risk to Plaintiff and Wisconsin Class Members as well as to the general public.

270.     As a direct and proximate result of Magellan Health's violations of Wis. Stat. § 100.18, Plaintiff and Wisconsin Class Members have suffered injury-in fact and/or actual damage.

271.     Plaintiff and Wisconsin Class Members are entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2).

272.     Because Magellan Health's conduct was committed knowingly and/or intentionally, Plaintiff and Wisconsin Class Members are entitled to treble damages.

273.     Plaintiff and Wisconsin Class Members also seek court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2).

274.     Plaintiff and Wisconsin Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Wisconsin Class Members.

/ /

/ /

### THIRTEENTH CAUSE OF ACTION
## VIOLATIONS OF THE OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, FLA. STAT. §§ 501.201, et seq.

(*On Behalf of Plaintiff Lewis and the Florida Subclass*)

275.    Plaintiffs restate and reallege paragraphs 1 through 114 as if fully set forth herein.

276.    Plaintiff Lewis and Florida Subclass members are "consumer[s]" as defined by Fla. Stat. § 501.203.

277.    Defendant engaged in the conduct alleged in this Complaint, and advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida, including Plaintiff Lewis and Florida Class Members.

278.    Defendant engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to the following:

    a.   failure to maintain adequate computer systems and data security practices to safeguard patient PII and/or PHI;

    b.   failure to disclose that its computer systems and data security practices were inadequate to safeguard patient PII and/or PHI from theft;

    c.   failure to timely and accurately disclose the Data Breach to Plaintiff and Florida Class members;

    d.   continued acceptance and storage of patient PII and/or PHI after Defendant knew or should have known of the security vulnerabilities of its network that were exploited in the Data Breach; and,

    e.   continued acceptance and storage of patient PII and/or PHI after Defendant knew or should have known of the Data Breach and before it allegedly remediated the Data Breach.

279.    These unfair acts and practices violated duties imposed by laws, including by not limited to the FTCA and Fla. Stat. § 501.171(2).

280.    As a direct and proximate result of Defendant's violation of the Florida Unfair and Deceptive Trade Practices Act, Plaintiff and Florida Class members suffered damages including, but not limited to damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, *inter alia*, by overpaying for the products and services sold by Defendant; closely reviewing and monitoring their medical transactions for unauthorized activity, filing police reports, and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

281.    Also, as a direct result of Defendant's knowing violation of the Florida Unfair and Deceptive Trade Practices Act, Plaintiff Lewis and Florida Class members are entitled to damages as well as injunctive relief, including, but not limited to:

    a.    Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

    b.    Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

    c.    Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

    d.    Ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendant's system is compromised, hackers cannot gain access to other portions of Defendant's system;

e.   Ordering that Defendant purge, delete, and destroy patient PII and/or PHI not necessary for its provisions of services in a reasonably secure manner;

f.   Ordering that Defendant conduct regular database scans and security checks;

g.   Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h.   Ordering Defendant to meaningfully educate its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps Defendant's customers should take to protect themselves.

282.   Plaintiff brings this action on behalf of himself and Florida Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Florida Class Members and the public from Defendant's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. Defendant's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

283.   The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Lewis and Florida Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

284.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard Florida Class Members' PII and/or PHI and that the risk of a data breach or theft was high.

285.   Defendant's actions and inactions in engaging in the unfair practices and deceptive acts described herein were negligent, knowing and willful, and/or wanton and reckless.

286.     Plaintiff and Florida Class Members seek relief under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*, including, but not limited to, damages, restitution, injunctive relief, and/or attorney fees and costs, and any other just and proper relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request the following relief:

A.   For an Order certifying this action as a Class action and appointing Plaintiffs and their counsel to represent the Class;

B.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII and PHI, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.   For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII and PHI compromised during the Data Breach;

D.   For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.   Ordering Defendant to pay for not less than seven years of credit monitoring services for Plaintiffs and the Class;

F.   For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.   For an award of punitive damages, as allowable by law;

H.   For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I.   Pre- and post-judgment interest on any amounts awarded; and

J.   Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class, demand a trial by jury on all issues so triable.

Dated: December 11, 2020

Respectfully submitted,

**ZIMMERMAN REED LLP**

By: s/ Hart L. Robinovitch
Hart L. Robinovitch (AZ SBN 020910)
14646 North Kierland Blvd., Suite 145
Scottsdale, AZ  85254
Telephone: (480) 348-6400
Facsimile: (480) 348-6415
Email: hart.robinovitch@zimmreed.com

**BONNETT, FAIRBOURN,
FRIEDMAN & BALINT, P.C.**

Elaine A. Ryan (AZ Bar #012870)
Carrie A. Laliberte (AZ Bar #032556)
2325 E. Camelback Rd., Suite 300
Phoenix AZ 85016
Telephone:  (602) 274-1100
Email:  eryan@bffb.com
              claliberte@bffb.com

**BONNETT,FAIRBOURN,
FRIEDMAN & BALINT, P.C.**

Patricia N. Syverson (AZ Bar #020191)
600 W. Broadway, Suite 900
San Diego, California 92101
Telephone: (619) 798-4593
Email:  psyverson@bffb.com

*Additional counsel:*

**MASON LIETZ & KLINGER LLP**

Gary E. Mason*
David K. Lietz*
5301 Wisconsin Ave, NW
Suite 305
Washington, DC 20016
Telephone: (202) 429-2290
Email:  gmason@masonllp.com
Email:  dlietz@masonllp.com

**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**

John A. Yanchunis**
Patrick A. Barthle**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Email:  jyanchunis@forthepeople.com
        pbarthle@forthepeople.com

**MASON LIETZ & KLINGER LLP**

Gary M. Klinger*
227 W. Monroe Street, Suite 2100
Chicago, IL 60630
Telephone: (312) 283-3814
Email:  gklinger@masonllp.com

**RHINE LAW FIRM, P.C.**

Joel R. Rhine**
Martin A. Ramey**
Janet R. Coleman**
1612 Military Cutoff Rd., Suite 300
Wilmington, NC 28403
Telephone:  (910) 772-9960
Email:  jrr@rhinelawfirm.com
        mjr@rhinelawfirm.com

**BERGER MONTAGUE PC**

Michael Dell'Angelo**
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone: (215) 875-3000
Email:  mdellangelo@bm.net

**KEHOE LAW FIRM, P.C.**

Michael K. Yarnoff**
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19102
Telephone: (215) 792-6676
Email:  myarnoff@kehoelawfirm.com


**DEYOUNG & ASSOCIATES**

Neal A. DeYoung*
One Reservoir Office Park
Southbury, Ct. 06488
Telephone: (203) 731-7558
Email:  neal@deyounglegal.com

*Counsel for Plaintiff and the Putative Class*

*\* Previously admitted pro hac vice*
*\*\* Pro hac vice to be filed*